**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**DANIEL MARTIN**,

       Plaintiff.

**v.**

**WORLD WIDE CHILD CARE CORP**, a
Delaware Corporation, **CHILDREN OF
AMERICA, INC**., a Florida Corporation,
**INTERNATIONAL CHILD CARE
MARKETING CORP.,** a Delaware
Corporation, **WORLD FILMS, INC**.,
a Delaware Corporation, **VISITEL
ENTERPRISES CORP.**, a Delaware
Corporation, **THAD PRYOR**, an individual
and **JAMES PERRETTY**, an individual

       Defendants.
_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

     Plaintiff Daniel Martin ("Mr. Martin"), by and through undersigned counsel,

hereby files this Complaint against Defendants Children of America ("COA"), World

Wide Child Care Corporation ("WWCC""), Visitel Enterprises Corp. ("Visitel"),

International Child Care Marketing Corp. ("ICCMC"), World Films, Inc. ("World

Films"), Thad Pryor, individually, ("Pryor") and James Perretty ("Perretty"),

individually, alleges as follows:

    1.   This action arises out of a fraudulent international stock scheme orchestrated by

Thad Pryor and James Perretty.

    2.   Pryor and Perretty established and created companies named Children of

America, World Wide Child Care Corp., International Child Care Marketing Corp.,

Visitel and World Films.

1

3.   Pryor and Perretty created and utilized "boiler rooms" located in the U.S. and foreign countries to sell WWCC, ICCMC, Visitel and World Films stock to international investors.  A "boiler room" operation is a business that employs high-pressure sales tactics to sell what are generally poorly performing or non-existent securities.

4.   Pryor or Perretty used the formation of these companies to swindle millions of dollars from international prospects, including Mr. Martin.  Defendants made millions of dollars through offerings by making material misrepresentations and omissions concerning companies' financial plans and business performance, as well as concerning its CEO, Pryor, who was previously convicted of drug trafficking in the State of Florida. Unlicensed salesman and brokers, acting under Pryor and Perretty's supervision and direction, were responsible for touting stock of these sham companies.  Pryor and Perretty enriched themselves at the expense of unsophisticated international investors.

5.   As a result of Defendants' action, Mr. Martin has lost hundreds of thousands of dollars.  By this action, Mr. Martin seeks damages against parties and persons who were responsible for participating in the fraud.

6.   Mr. Martin is a citizen and resident of the Country of Belgium.

7.   WWCC is a Delaware corporation with its principal place of business located in Palm Beach County, Florida.  WWCC's principal place of business is located at 5300 W. Atlantic Avenue, Suite 700, Delray Beach, Florida 33484.  Visitel and International Child Care Corporation merged to form WWCC.  WWCC maintains a website at www.iccmc.com, but the website has no information on it. The WWCC website directs the reader to the COA website. The website states, "Worldwide Child Care Corporation, through ownership in Children of America, enjoys a leadership position in the growing

field of child education and development." WWCC owns 86% of COA. WWCC

acquired the shares in COA well after COA was established.  COA, Visitel and WWC are

located in the very same office leased by COA and use the same telephone number.

WWCC uses COA's property as its own.  WWWC also raised money for COA through

stock sales, and used it to pay for operational expenses. Through WWCC, Pryor, and

Perretty claim the money was used to fund COA operations, at least a significant portion

of the monies raised were believed to be used to enrich the principal owners of WWCC.

WWCC pays the salaries of COA employees, including Perretty, its current President and

CEO.  WWCC was organized only to defraud creditors of COA and WWCC.   At al

times throughout, WWCC and COA had common directors and officers.  In 2007 and

2008, Pryor, Perretty and Joseph Letzelter were listed as officers.  Letzelter was listed as

Treasurer.  In 2009 until 2013, Pryor and Perretty were the only two listed officers and

directors of WWCC.  Perretty was listed as President in 2014 and 2015.  WWCC has not

held a meeting of shareholders or sent out proxies to vote on the appointment of Board of

Directors.  Thus, WWCC has failed to observe the corporations legal requirements.

WWCC is listed on the OTC Pink Sheets under the symbol of WWCC.  WWCC is a

holding company of COA.   WWCC has never field a document with the Securities &

Exchange Commission. WWCC has always been inadequately capitalized.  According to

Bloomberg, WWCC has 26,500,000 shares outstanding.  COA and WWCC have

conducted their affairs in such a manner that their separate existences no longer exist, that

WWCC and COA are the alter ego of each other, and that the observance of the corporate

form would promote injustice or an inequitable result.  WWCC dominates COA to such

an extent that WWC and COA's independent existence is non-existent.  Thus, in

determining liability, the corporate veil should be pierced and COA and WWCC should be deemed mere alter egos, and furthermore, alter egos of all Defendants.

8.   COA is a Florida corporation with its principal place of business located in Palm Beach County, Florida.  COA's principal place of business is located at 5300 W. Atlantic Avenue, Suite 700, Delray Beach, Florida 33484.  COA is a subsidiary of WWCC.  COA maintains a website on the Internet at www.childrenofamerica.com.  Pryor and Perretty were the only two officers and directors of COA from 2005-July 2013.  In July 2013, Perretty was named President.  Joseph Letzelter was a high level executive with the company, including the CFO during various times between 2005-2013.  Letzelter is currently the EVP in charge of real estate for COA.

9.   Visitel is a Delaware corporation with its principal place of business located in Palm Beach County, Florida.  Visitel's principal place of business is located at principal place of business is located at 5300 W. Atlantic Avenue, Suite 700, Delray Beach, Florida 33484.  Visitel is a private company that has never traded publically in any market.  Visitel was the real estate division of COA.  Visitel and ICCP merged in May 2007.  WWCC was the name of the newly created entity.  Thus, through a merger WWCC and COA dominated Visitel to such an extent that Visitel's and COA's independent existence is non-existent.  Visitel and COA are located in the same office leased by COA.  Visitel uses COA's property as its own. COA also pays the salaries of Visitel's employees.  Visitel is not adequately capitalized.  Visitel, WWCC and COA had common directors and officers.  Pryor and Perretty were two of the three officers and directors of Visitel from 2002 until 2014.

10. ICCMC is a Delaware corporation with its principal place of business located in Palm Beach County.  ICCMC's principal place of business is located at principal place of business is located at 5300 W. Atlantic Avenue, Suite 700, Delray Beach, Florida 33484. ICCMC is a holding company for WWCC shares.  ICCMC maintained a website at www.iccmc.com, which contains one page information about WWCC.  At all times material herein, ICCMC had common directors and management with COA and WWCC. Pryor was the only officer and director of ICCMC from 2006 until 2013.  In 2014 and 2015, Perretty was listed as the only officer and director of ICCMC.  COA, Visitel, WWCC, and ICCMC are all located  in the very same office leased by COA, and use the same telephone number.  ICCMC uses COA's property as its own.

11. World Films is a Delaware Corporation with its principal place of business located in Palm Beach County, Florida.  World Films's principal place of business is located at principal place of business is located at 5300 W. Atlantic Avenue, Suite 700, Delray Beach, Florida 33484.  World Films maintained a website on the Internet at www.worldfilms.com.  World Films is a private company that has never been publically traded in any market.  Pryor, Perretty and Joseph Letzelter were listed as the only officers and directors of World Films in 2007 and 2008.  Joseph Letzelter was named President from 2007 until 2013.  World Films, COA, Visitel, WWCC, and ICCMC are all located in the very same office leased by COA, and use the same telephone number.  World Films uses COA's property as its own.  World Films was inadequately capitalized, having to raise money from unregistered stock offerings.

12. Pryor is a resident of Palm Beach County, Florida.  At all times material herein, Pryor was the Chairman and Chief Executive Officer of WWCC; President and Director

of COA; President of Visitel; President, Secretary, Treasurer and Director of ICCMC; and Chairman of World Films.  On July 31, 1984, Pryor was sentenced to 18 months in prison for drug trafficking and his involvement in a drug smuggling ring.  Pryor was incarcerated for 18 months.  Pryor has been named as a defendant in lawsuits where money was demanded from him over 14 times between 1983 and 2010.

13. Perretty is a resident of Palm Beach County, Florida.  Perretty was previously sued for securities fraud in 2003, and in 2010 involving the same matter as this action.

## JURISDICTION AND VENUE

14. Subject matter jurisdiction is invoked pursuant to 28 U.S.C. 1331.  This action is authorized and instituted pursuant to Section 10(b) and 20(a) of the Exchange Act, and the rules and regulations promulgated thereunder.

15. Subject matter jurisdiction is also invoked pursuant to 28 U.S.C. 1332, as the parties are completely diverse in citizenship, and the amount in controversy exceeds $75,000.

16. Venue is proper in this District by reason of 28 U.S.C. 1391(b)(2), because a substantial part of the events giving rise to Plaintiff's claims occurred in Palm Beach County, Florida.

## FACTS

17. Pryor and/or Perretty established WWCC, ICCMC, Visitel and World Films.

18. Pryor and/or Perretty sold stock in these entities to foreign investors, such as Plaintiff.

19. WWCC, ICCMC, Visitel and World Films have not at any time issued a prospectus or made any disclosures to investors including Mr. Martin.

20. Mr. Martin's stock purchases all closed in the United States.  A licensed stock transfer company named Continental Stock Transfer & Trust Company, located in New York, New York, completed the purchases and sales of shares.  The transactions for the acquisition of Visitel, ICCMC, WWCC and World Films stock were completed by the companies submitting the stock transfer documents to Continental Stock.

21. To bolster their credibility as established businesses, at the direction of Pryor and/or Perretty, websites were created for the boiler rooms with content that was plagiarized from legitimate tax and investment planning companies.

22. Pryor and the other defendants hired unregistered cold callers or "fronters" to tout the stocks of Visitel, ICCMC, WWCC and World Films to unsophisticated international investors.  These "fronters" made thousands of cold telephone calls a month to investors.  The "fronters" identified likely prospects during these calls, and handed them over to the "closers' to finish the sale.

23. The fronters were provided a sheet of different addresses and names of companies.  These salespeople were directed to represent themselves as salesmen from one of the companies listed on the sheet, which included an address.  The cold callers were paid substantial commissions on the sales he or she generated.

24. The cold callers acted under the direction of Pryor and/or Perretty.

25. One of the salespersons identified himself as Bruce Cooper, who in fact was Charles Crowe Jr. ("Cooper"), an employee of COA, WWCC, World Films, Pryor and Perretty.

26. Pryor and Perretty supervised and controlled the individuals working in the boiler rooms—"fronters" and "closers"—who called prospects, using high pressure sales

tactics, touting the stock of the companies by making material misrepresentations. Many investors, including Mr. Martin, wired monies to purchase stock in the companies in sole reliance on the material misrepresentations and omissions made by the cold callers stationed in the "boiler rooms."

27. Based on a structure created by Pryor and Perretty, the boiler rooms directed the prospects to send their money to escrow agents located in the U.S. and abroad.

28. The money generated from these sales was split between Pryor and Perretty, who received a majority of the profits, and their cold callers, who were paid a percentage for closing the sale.

29. Mr. Martin was a victim of Defendants' fraudulent scheme. Mr. Martin made the stock purchases and exchanges identified below as a result of the high-pressure sales tactics of the cold callers working in the boiler rooms, who were directed, supervised and employed by Pryor and Perretty.

30. Mr. Martin was first solicited by Chris Alexander, Senior Portfolio Manager for ICCMC. Mr. Martin subsequently purchased 500 shares on April 15, 2003; 500 shares on September 10, 2003 and 600 shares on January 14, 2004. All of the share certificates were signed by Pryor as President and Secretary of ICCMC. On March 2, 2006, Mr. Martin was notified that Alexander was no longer working with ICCMC.

31. Subsequently, Cooper and Frank Top (ICCMC Senior Advisor of Investor Relations) on behalf of the Defendants, solicited Mr. Martin to purchase Visitel stock on several occasions.

32. Visitel was the real estate arm of COA run by Joseph Letzelter.

33. Before Mr. Martin purchased each share of Visitel stock, Cooper and Top represented and assured Martin that Visitel was a sound investment.  In each conversation, Cooper, Top and Visitel omitted (a) Pryor was previously convicted of trafficking and spent 18 months in prison; (b) Pryor was defendant in several civil lawsuits where money was ought from him; (c) the Securities and Exchange Commission entered permanent injunctions baring Letzelter from perpetrating frauds on investors; (d) the United States of America charged Letzelter with conspiracy to commit bank fraud, securities fraud, money laundering, and bankruptcy false statements; (e) omitted that Letzelter as found guilty of conspiracy to commit bank and securities fraud, and money laundering; (f) omitted that Cooper was an unlicensed salesman working for a non-registered broker-dealer; (g) omitted that the stock Mr. Martin purchased was sold to him out of a boiler room operation rather than by a licensed salesperson and broker-dealer; (h) misrepresented his true identity, which was Charles Crowe Jr.

34. As a result of Cooper's misrepresentations and omissions, Mr. Martin purchased shares of Visitel on June 9, 2006, June 16, 2006, July 12, 2006 and September 25, 2006 for a total of 2000 shares.

35. The purchase price Defendants sold the stock to Mr. Martin was not based upon any metric or valuation of Visitel.  Instead, Defendants sold the stock to Mr. Martin at artificially inflated prices and excessive markups.  Visitel did not trade in any public marketplace.

36. Mr. Martin also received calls from Cooper regarding purchasing ICCMC stock. In each conversation, Cooper omitted a) Pryor was previously convicted of trafficking and spent 18 months in prison; (b) Pryor was defendant in several civil lawsuits where

money was ought from him; (c) the Securities and Exchange Commission entered permanent injunctions baring Letzelter from perpetrating frauds on investors; (d) the United States of America charged Letzelter with conspiracy to commit bank fraud, securities fraud, money laundering, and bankruptcy false statements; (e) omitted that Letzelter as found guilty of conspiracy to commit bank and securities fraud, and money laundering; (f) omitted that Cooper was an unlicensed salesman working for a non-registered broker-dealer; (g) omitted that the stock Mr. Martin purchased was sold to him out of a boiler room operation rather than by a licensed salesperson and broker-dealer; (h) misrepresented his true identity, which was Charles Crowe Jr.

37. As a result of Cooper's misrepresentations and omissions, Mr. Martin purchased shares of ICCMC on May 16, 2007.  Mr. Martin's purchase was at an excessive markup given that ICCMC only generated $48,793 in revenue in 2006.

38. On May 16, 2007, Pryor, Perretty, WWCC and COA, without a shareholder vote, merged Visitel and a company named International Child Care Corporation.  The new name of the company was WWCC.  WWCC is the successor in interest to Visitel.  The Defendants also initiated a reverse stock split of the stock, which made it appear to investors that the company was more valuable.  This was done for the sole purpose of concealing the fraud committed upon Mr. Martin and other Visitel investors.

39. Mr. Martin also received calls from Cooper regarding purchasing WWCC stock. In each conversation, Cooper omitted a) Pryor was previously convicted of trafficking and spent 18 months in prison; (b) Pryor was defendant in several civil lawsuits where money was ought from him; (c) the Securities and Exchange Commission entered permanent injunctions baring Letzelter from perpetrating frauds on investors; (d) the

United States of America charged Letzelter with conspiracy to commit bank fraud, securities fraud, money laundering, and bankruptcy false statements; (e) omitted that Letzelter as found guilty of conspiracy to commit bank and securities fraud, and money laundering; (f) omitted that Cooper was an unlicensed salesman working for a non-registered broker-dealer; (g) omitted that the stock Mr. Martin purchased was sold to him out of a boiler room operation rather than by a licensed salesperson and broker-dealer; (h) misrepresented his true identity, which was Charles Crowe Jr.

40. As a result of Cooper's misrepresentations and omissions, Mr. Martin purchased shares of WWCC on June 12, 2007 and July 2, 2007.  Mr. Martin's purchase was at an excessive markup given that from January 2007 to the present, the stock was thinly traded and COA had only $359,104 in net income at the end of 2006 and 26,500,000 shares outstanding after the stock split on May 21, 2007, according to Bloomberg.

41. Mr. Martin also received calls from Cooper and "Eric" regarding purchasing World Films stock.  Mr. Martin purchased 1500 shares on February 26, 2008 and 2000 shares on October 28, 2008.  In each conversation, Cooper omitted (a) Pryor was previously convicted of trafficking and spent 18 months in prison; (b) Pryor was defendant in several civil lawsuits where money was ought from him; (c) the Securities and Exchange Commission entered permanent injunctions baring Letzelter from perpetrating frauds on investors; (d) the United States of America charged Letzelter with conspiracy to commit bank fraud, securities fraud, money laundering, and bankruptcy false statements; (e) omitted that Letzelter as found guilty of conspiracy to commit bank and securities fraud, and money laundering; (f) omitted that Cooper was an unlicensed salesman working for a non-registered broker-dealer; (g) omitted that the stock Mr.

Martin purchased was sold to him out of a boiler room operation rather than by a licensed salesperson and broker-dealer; (h) misrepresented his true identity, which was Charles Crowe Jr.

42. As a result of Cooper's misrepresentations and omissions, Mr. Martin purchased shares of WWCC on July 9, 2008.  The price Mr. Martin paid was clearly excessive as there was no market quoting the price of World Films, which had no real revenues.

43. Defendants also caused Mr. Martin to pay additional money to unestablished fake entities in connection with his purported share purchases.  Defendants purported to be government agents, or released Mr. Martin's private information to other boiler room operators.

44. Mr. Martinwas solicited by a fake entity called Credit Corp Securities.  Credit Corp Securites purported to act under "mandate of the U.S. Government" to aid investors in recapturing losses on bad investments.  Mr. Martin purchased securities in several fake entities through Credit Corp, including one called Sol Solar Power Co. Ltd.

45. As another example, Mr. Martin was contacted by "Edward Lopez" who presented himself as a Federal Agent from the FDIC.  Mr. Lopez told Mr. Martin that he was a plaintiff in a court case involving a fake entity called Goldman Capital Management.  Mr. Lopez provided documents to Mr. Martin which appeared to authentic court pleadings (i.e. Class Settlement Order), signed by John G. Roberts, Jr., Chief Justice.  After receiving the purported Order, "Ron Garcia", another person holding himself out as a Federal Agent sent a "Bill of Costs" to Mr. Martin demanding the sum of $6,221.38 related to the Order.  Mr. Martin paid this amount care of a Bank of America

bank account in the name of "Total Market Solutions LLC".  Subsequently, Mr. Martin

contacted the FDIC and learned that it did not employ anyone named "Ron Garcia".

46. Mr. Martin was then solicited several more times by persons acting under

governmental authority, including "Joseph H. Grant", Acting Commissioner from the

Tax Exempt Government Entities Division, Department of the Treasury, Internal

Revenue Service, requesting Mr. Martin pay an additional $32,255.62 for purported tax

liabilities on the Class Settlement Order.  Mr. Martin did not pay the requested amount.

47. In January 2015, Mr. Martin was contacted by "Robert Nguyen" purportedly on

behalf of First Management Advisory, Ltd., another fake company using a New Jersey

address.  Mr. Nguyen stated that First Management Advisory, Ltd. was a "social advisory

institution that has been tasked by the U.S. Department of the Treasury to be on service to

process and assist all local and international investors who have been victimized or left

behind by companies and financial institutions who have been restricted to do further

business."  Mr. Nguyen requested substantial financial information in order to be placed

in the "Stock Holders Amnesty Program."  Again, Mr. Martin declined to provide the

requested information.

## COUNT 1—VIOLATION OF SECTION 10(b) and RULE 10-b(5) of the

## EXCHANGE ACT (MISSTATEMENTS AND OMISSIONS) AGAINST

## WORLD WIDE CHILD CARE CORPORATION

## AND CHILDREN OF AMERICA

48. Plaintiff adopts and re-alleges the allegations contained herein as if fully set forth.

49. WWCC and COA utilized boiler rooms in selling the securities of WWCC,

ICCMC, and World Films.

50. WWCC and COA directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or (c) engaged in acts, practices and courses of business which operated as a fraud or deceit upon Mr. Martin of such securities.

51. As a result of this conduct, WWCC and COA violated Section 10(b) of the Exchange Act and 10b-5 thereunder.

52. WWCC and COA substantially participated and/or were inextricably involved in the material misrepresentations and omissions.

53. WWCC and COA are liable for the materially false and misleading statements and omissions made to Mr. Martin.

54. WWCC and COA are liable for all materially false and misleading statements and omissions made to Mr. Martin.

55. As described above, WWCC and COA acted with scienter in that it had actual knowledge of the false representations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth.

56. Mr. Martin reasonably relied on the misrepresentations and omissions made by WWCC and COA, and incurred substantial damages as a direct and proximate result.

57. Mr. Martin purchased, held, and exchanged shares in WWCC, ICCMC and World Films, which have and/or had no discernible value or marketability.

58. Mr. Martin has suffered damages in that, in direct reliance on WWCC and COA's misrepresentations and omissions, purchased stock, held and exchanged shares in WWCC, ICCMC and World Films, which had no value or marketability for the shares.

59. By engaging in the conduct described above, WWCC and COA violated Sections 10(b) of the Exchange Act, 15 U.S.C. 78(j)(b) and Rule 10-5 thereunder, 17 C.F.E. 240.10b-5.

60. As a direct and proximate result of WWCC and COA's wrongful conduct, Mr. Martin suffered damages in connection with his purchase and/or exchanges of WWCC, ICCMC and World Films.

61. Further in determining liability, the Court should pierce the corporate veil and deem that COA and WWCC are mere alter egos.  As such, any liability as to WWCC will become the liability of defendant COA, and any liability as to COA, will become liability of WWCC.  Additionally, any liability as to Visitel will become liability of WWCC, as WWCC is the successor in interest to Vitsitel through a merger.

## COUNT II—VIOLATION OF SECTION 10(b) and RULE 10-b(5) of the EXCHANGE ACT (MISSTATEMENTS AND OMISSIONS) AGAINST VISITEL

62. Plaintiff adopts and re-alleges the allegations contained herein as if fully set forth.

63. Visitel, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under

which they were made, not misleading or (c) engaged in acts, practices and courses of business which operated as a fraud or deceit upon Mr. Martin of such securities.

64. As a result of this conduct, Visitel violated Section 10(b) of the Exchange Act and 10b-5 thereunder.

65. Visitel substantially participated and/or were inextricably involved in the material misrepresentations and omissions.

66. Visitel is liable for the materially false and misleading statements and omissions made to Mr. Martin.

67. Visitel is liable for all materially false and misleading statements and omissions made to Mr. Martin.

68. As described above, Visitel acted with scienter in that it had actual knowledge of the false representations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth.

69. Mr. Martin reasonably relied on the misrepresentations and omissions made by Visitel, and incurred substantial damages as a direct and proximate result.

70. Mr. Martin purchased, held, and exchanged shares in WWCC, ICCMC and World Films, which have and/or had no discernible value or marketability.

71. Mr. Martin has suffered damages in that, in direct reliance on Visitel's misrepresentations and omissions, purchased tock, held and exchanged shares in WWCC, ICCMC and World Films, which had no value or marketability for the shares.

72. By engaging in the conduct described above, Visitel violated Sections 10(b) of the Exchange Act, 15 U.S.C. 78(j(b) and Rule 10-5 thereunder, 17 C.F.E. 240.10b-5.

73. As a direct and proximate result of Visitel's wrongful conduct, Mr. Martin suffered damages in connection with his purchase and/or exchanges of WWCC, ICCMC and World Films.

74. Further in determining liability, the Court should pierce the corporate veil and deem that COA, WWCC and Visitel are mere alter egos.  As such, any liability as to Visitel will become the liability of defendant COA and WWCC, and any liability as to WWCC and COA, will become liability of Visitel.

## COUNT III—VIOLATION OF SECTION 10(b) and RULE 10-b(5) of the EXCHANGE ACT (MISSTATEMENTS AND OMISSIONS) AGAINST ICCMC

75. Plaintiff adopts and re-alleges the allegations contained herein as if fully set forth.

76. ICCMC directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or (c) engaged in acts, practices and courses of business which operated as a fraud or deceit upon Mr. Martin of such securities.

77. As a result of this conduct, ICCMC violated Section 10(b) of the Exchange Act and 10b-5 thereunder.

78. ICCMC substantially participated and/or were inextricably involved in the material misrepresentations and omissions.

79. ICCMC is liable for the materially false and misleading statements and omissions made to Mr. Martin.

80. ICCMC is liable for all materially false and misleading statements and omissions made to Mr. Martin.

81. As described above, ICCMC acted with scienter in that it had actual knowledge of the false representations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth.

82. Mr. Martin reasonably relied on the misrepresentations and omissions made by ICCMC, and incurred substantial damages as a direct and proximate result.

83. Mr. Martin purchased, held, and exchanged shares in WWCC, ICCMC and World Films, which have and/or had no discernible value or marketability.

84. Mr. Martin has suffered damages in that, in direct reliance on ICCMC's misrepresentations and omissions, purchased tock, held and exchanged shares in WWCC, ICCMC and World Films, which had no value or marketability for the shares.

85. By engaging in the conduct described above, ICCMC violated Sections 10(b) of the Exchange Act, 15 U.S.C. 78(j(b) and Rule 10-5 thereunder, 17 C.F.E. 240.10b-5.

86. As a direct and proximate result of ICCMC's wrongful conduct, Mr. Martin suffered damages in connection with his purchase and/or exchanges of WWCC, ICCMC and World Films.

## COUNT IV—VIOLATION OF SECTION 10(b) and RULE 10-b(5) of the EXCHANGE ACT (MISSTATEMENTS AND OMISSIONS) AGAINST WORLD FILMS

87. Plaintiff adopts and re-alleges the allegations contained herein as if fully set forth.

88. World Films, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of

securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or (c) engaged in acts, practices and courses of business which operated as a fraud or deceit upon Mr. Martin of such securities.

89. As a result of this conduct, World Films violated Section 10(b) of the Exchange Act and 10b-5 thereunder.

90. World Films substantially participated and/or were inextricably involved in the material misrepresentations and omissions.

91. World Films is liable for the materially false and misleading statements and omissions made to Mr. Martin.

92. World Films is liable for all materially false and misleading statements and omissions made to Mr. Martin.

93. As described above, World Films acted with scienter in that it had actual knowledge of the false representations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth.

94. Mr. Martin reasonably relied on the misrepresentations and omissions made by World Films, and incurred substantial damages as a direct and proximate result.

95. Mr. Martin purchased, held, and exchanged shares in WWCC, ICCMC and World Films, which have and/or had no discernible value or marketability.

96. Mr. Martin has suffered damages in that, in direct reliance on World Films' misrepresentations and omissions, purchased tock, held and exchanged shares in WWCC, ICCMC and World Films, which had no value or marketability for the shares.

97. By engaging in the conduct described above, World Films violated Sections 10(b) of the Exchange Act, 15 U.S.C. 78(j)(b) and Rule 10-5 thereunder, 17 C.F.E. 240.10b-5.

98. As a direct and proximate result of World Films' wrongful conduct, Mr. Martin suffered damages in connection with his purchase and/or exchanges of WWCC, ICCMC and World Films.

## COUNT V—VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THAD PRYOR AND JAMES PERETTY

99. Plaintiff adopts and re-alleges the allegations contained herein as if fully set forth.

100.      This Count is asserted against Defendants Pryor and Perretty for violations of Section 20(a) of the Exchange Act, 15 U.S.C. 78t(a).

101.      Pryor and Perretty were the controlling persons of Visitel, ICCMC, WWCC, COA and World Films within the meaning of Section 20(a) of the Exchange Act.  As detailed above, at all time the statements and omissions were made throughout this section, Pryor was the Chairman and CEO of WWCC; President and Director of COA; President of Visitel; President, Secretary, Treasurer and Director of ICCMC and Chairman of World Films; Perretty was the Secretary and Treasurer of Visitel; the Secretary of WWCC and Vice President and Secretary of COA.

102.      Pryor and Perretty also established, operated, owned, directed and controlled the boiler rooms selling the shares of Visitel, ICCMC, WWCC and World Films, located in the foreign countries.

103.      By reason of their position and control and authority of COA, Visitel, ICMC, WWCC, and World Films, Pryor and Perretty had the power and authority to cause COA, Visitel, ICCMC, WWCC, and World Films, to engage in the wrongful

conduct complained of herein.  These Defendants were able to, and did control, directly and indirectly, the content of the statements made by the telemarketers alleged throughout this complaint, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

## COUNT VI-VIOLATION OF FDUTPA (FLA. STAT. 501.204 et. seq.) AGAINST VISITEL, ICCMC, WWCC, COA, WORLD FILMS, PRYOR AND PERETTY

104.     Plaintiff adopts and re-alleges the allegations contained herein as if fully set forth.

105.     This is a claim for violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. 501.201-501.213.

106.     FDUTPA provides that unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any "trade or commerce" are unlawful.  Fla. Stat. 501.204.  Under FDUTPA, "trade or commerce" is broadly defined to include the "advertising, soliciting, providing, offering or distributing, whether by sale, rental or otherwise, any good or service, or any property."  Fla. Stat. 501.203(08).

107.     Each of the Defendants named herein employed practices that are unfair and deceptive in conducting trade or commerce.

108.     Specifically, through the establishment and usage of "boiler rooms', Pryor and Perretty established, managed, and controlled, each of the Defendants fraudulently induced Mr. Martin to purchase worthless stocks in the following non-established private and public companies:  Visitel, ICCMC, WWCC and World Films.

109.     COA, Visitel, ICCMC, WWCC and World Films, through Cooper, Top and others, made sales pitches to Mr. Martin which were replete with false information and omissions to convince him to purchase the stocks they were touting.

110.     WWCC, COA, Pryor and Perretty, through control over the boiler room, made specific material misrepresentations and omission detailed in this Complaint. Cooper, acting at the specific direction of Pryor, Perretty, COA and WWCC made specific material misrepresentations about COA, WWCC, ICCMC, Visitel and World Films to Mr. Martin.  Cooper was acting within the scope of his authority.

111.     Visitel made the false representations and omissions detailed in this Complaint.  Visitel also sold stock to Mr. Martin at an excessive markup without any basis for the price.  Moreover, Defendants failed to use any financial metrics in determining Visitel's price per share to Mr. Martin.

112.     ICCMC made the false representations and omissions detailed in this Complaint.  ICCMC also sold stock to Mr. Martin at an excessive markup without any basis for the price.  Moreover, Defendants failed to use any financial metrics in determining ICCMC's price per share to Mr. Martin.

113.     World Films made the false representations and omissions detailed in this Complaint.  World Films also sold stock to Mr. Martin at an excessive markup without any basis for the price.  Moreover, Defendants failed to use any financial metrics in determining World Films' price per share to Mr. Martin.

114.     Mr. Martin relied on those representations and omissions, and as result, agreed to purchase stock from the Defendants.

115.     As a direct and proximate result of Defendants' unfair and deceptive acts, Mr. Martin has suffered damages.

116.     Further in determining liability, the Court should pierce the corporate veil and deem that COA, WWCC and Visitel are mere alter egos.  As such, any liability as to Visitel will become the liability of defendant COA and WWCC, and any liability as to WWCC and COA, will become liability of Visitel.

## COUNT VIII-COMMON LAW FRAUD AGAINST VISITEL, ICCMC, WWCC, COA, WORLD FILMS, PRYOR AND PERRETTY

117.     Plaintiff adopts and re-alleges the allegations contained herein as if fully set forth.

118.     In connection with Mr. Martin's purchases and/or exchanges of Visitel, ICCMC, WWCC and World Films stock, Defendants knowingly and/or recklessly made numerous material misstatements and omissions about each company.

119.     WWCC, COA, Pryor and Perretty, through control over the boiler room, made specific material misrepresentations and omission detailed in this Complaint. Cooper, acting at the specific direction of Pryor, Perretty, COA and WWCC made specific material misrepresentations about COA, WWCC, ICCMC, Visitel and World Films to Mr. Martin.  Cooper was acting within the scope of his authority.

120.     Visitel made the false representations and omissions detailed in this Complaint.  Visitel also sold stock to Mr. Martin at an excessive markup without any basis for the price.  Moreover, Defendants failed to use any financial metrics in determining Visitel's price per share to Mr. Martin.

121.     ICCMC made the false representations and omissions detailed in this Complaint.  ICCMC also sold stock to Mr. Martin at an excessive markup without any basis for the price.  Moreover, Defendants failed to use any financial metrics in determining ICCMC's price per share to Mr. Martin.

122.     World Films made the false representations and omissions detailed in this Complaint.  World Films also sold stock to Mr. Martin at an excessive markup without any basis for the price.  Moreover, Defendants failed to use any financial metrics in determining World Films' price per share to Mr. Martin.

123.     Pryor and Perretty encouraged, directed and had full knowledge their boiler room employees made these false representations for the purpose of convincing investors, including Mr. Martin to purchase their worthless securities.

124.     Defendants made these material misrepresentations and omissions with the intent of inducing Mr. Martin to rely on them in deciding to purchase, hold, exchange shares and purchase additional shares in Visitel, ICCMC, WWCC and World Films stock.

125.     Mr. Martin would not have purchased, held, exchanged and/or purchased additional shares in Visitel, ICCMC, WWCC and World Films stock but for his reliance on the misrepresentations and omissions of the Defendants and their agents.

126.     Mr. Martin reasonably relied on the misrepresentations and omissions made by Defendants in deciding to purchase, hold, exchange and/or purchase additional Visitel, ICCMC, WWCC and World Films shares.

127.     Mr. Marin suffered substantial damages as a direct result of the material misrepresentations and omissions made by each of the Defendants.

128.     In determining liability, the Court should pierce the corporate veil and deem that COA and WWCC are mere alter egos.  Any liability as to WWCC will become liability of COA, and any liability as to COA will become liability of WWCC.  Any liability as to Visitel will become liability of WWCC as WWCC is the successor in interest to Visitel through a merger.

## COUNT IX- NEGLIGENT MISREPRESENTATION AGAINST WWCC, ICCMC, COA, WORLD FILMS, AND VISITEL

129.     Plaintiff adopts and re-alleges the allegations contained herein as if fully set forth.

130.     Defendants made false statements and/or omissions concerning material facts to Mr. Martin regarding Visitel, ICCMC, COA, WWCC and World Films, which the Defendants knew or reasonably should have known were false.

131.     Defendants acted through Cooper (and others) who were acting in the course and scope of their duties as employees and/or agents of the Defendants.

132.     Defendants made false statements and/or omissions with the intention that Mr. Martin would purchase stock in Visitel, ICCMC, COA, WWCC and World Films.

133.     Mr. Martin reasonably and justifiably relied to his detriment on the false statements and/or omissions in connection with his purchases of Visitel, ICCMC, COA, WWCC and World Films stock.

134.     Mr. Martin has incurred substantial damages as a direct and proximate result of Defendants' conduct.

135.     In determining liability, the Court should pierce the corporate veil and deem that COA and WWCC are mere alter egos.  Any liability as to WWCC will become

liability of COA, and any liability as to COA will become liability of WWCC.  Any liability as to Visitel will become liability of WWCC as WWCC is the successor in interest to Visitel through a merger.

### COUNT X—CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

136.     Plaintiff adopts and re-alleges the allegations contained herein as if fully set forth.

137.     Defendants acted with a malicious motive and entered into a conspiracy with each other to do unlawful acts through unlawful means, including, but not limited to, defrauding Mr. Martin out of hundreds of thousands of dollars by intentionally selling him worthless and/or fake securities.

138.     The Defendants, including the individual defendants, have a stake in the fraudulent activities separate and apart from each other.  Pryor and Perretty have been paid directly funds from the boiler room operations.  Each of the corporate defendants have interests separate and apart from one.

139.     The Defendants committed one or more overt acts in pursuance of the conspiracy, which included: (a) establishing "boiler rooms" for the purposes of swindling investors, such as Mr. Martin to pay money for stock in Visitel, ICCMC, WWCC, COA and World Films stock based on false representations and omissions; (b) using boiler room operations and unlicensed salesman to sell the stock of their companies; (c) making false statements and omissions in connection with stock sales; (d) creating websites using material stolen from legitimate companies, which made it appear to be a suitable investment.

140.     Defendants directed and instructed cold callers to make false representations and omissions, and promised to pay them substantial commissions if they were successful in convincing any prospect, such as Mr. Martin, to pay money for Visitel, ICCMC, WWCC, COA and World Films stock.

141.     Mr. Martin has sustained damages as a direct and proximate result of the unlawful conspiracy between and among these Defendants.

142.     In determining liability, the Court should pierce the corporate veil and deem that COA and WWCC are mere alter egos.  Any liability as to WWCC will become liability of COA, and any liability as to COA will become liability of WWCC.  Any liability as to Visitel will become liability of WWCC as WWCC is the successor in interest to Visitel through a merger.

<strong>COUNT XI- BREACH OF FIDUCIARY DUTY</strong>

<strong>AGAINST WWCC, PRYOR AND PERRETTY</strong>

143.     Plaintiff adopts and re-alleges the allegations contained herein as if fully set forth.

144.     WWCC, Pryor and Perretty owed Mr. Martin a fiduciary duty, as one of the shareholders of their company.

145.     WWCC, Pryor and Perretty owed Mr. Martin the duties of care and loyalty.  WWCC, Pryor and Perretty had a duty to warn Mr. Martin of the scams and fraudulent schemes identified herein.

146.     WWCC, Pryor and Perretty breached their duties by failing to advise Mr. Martin that there were fraudulent entities and organization representing to him that he owed money for withholding taxes and IRS liens.

147.      Mr. Martin has been damaged as a direct and proximate result of the breach.

WHEREFORE, Plaintiff Daniel Martin respectfully prays for the following relief:

(1) That pursuant to Counts I through IV for violations of Section 10(b) and Rule 10b-5 of the Exchange Act, judgment be entered in favor of Plaintiff and against each of the Defendants for securities fraud in violation of SEC Rule 10b-5, plus attorneys' fees and costs, in an amount to be proven at trial;

(2) That pursuant to Count V for violations of Section 20(a) of the Exchange Act, judgment be entered in favor of Plaintiff and against Thad Pryor and James Perretty for securities fraud in violation of 20(a) of the Exchange Act, , plus attorneys' fees and costs, in an amount to be proven at trial;

(3) That pursuant to Count VI for violations of FDUTPA, judgment be entered in favor of Plaintiff and against Defendants for violations of 501.204, and demands all actual and compensatory damages, rescission of the stock purchases and attorneys' fees and costs, in an amount be proven at trial;

(4) That pursuant to Count VII for common law fraud, judgment be entered in favor of Plaintiff and against each of the Defendants, for all actual and compensatory damages, rescission of the stock purchases and attorneys' fees and costs and punitive damages, in an amount be proven at trial;

(5) That pursuant to Count VIII for negligent misrepresentation, judgment be entered in favor of Plaintiff and against each of the Defendants, for all actual and compensatory damages, rescission of the stock purchases and attorneys' fees and costs and punitive damages, in an amount be proven at trial;

(6) That pursuant to Count IX for civil conspiracy, judgment be entered in favor of Plaintiff and against each of the Defendants, for all actual and compensatory damages, rescission of the stock purchases and attorneys' fees and costs and punitive damages, in an amount be proven at trial;

(7) That pursuant to Count X for breach of fiduciary duty, judgment be entered in favor of Plaintiff and against each of the Defendants, for all actual and compensatory damages, rescission of the stock purchases and attorneys' fees and costs and punitive damages, in an amount be proven at trial;

(8) That Plaintiff be awarded prejudgment interest as provided at law;

(9) That Plaintiff be awarded all costs of this action;

(10) That the Court pierce the corporate veil and deem that COA and WWCC are mere alter egos.  As such and liability as to WWCC will become liability of COA, and any liability as to COA will become liability of WWCC;

(11) That any liability as to Visitel will become liability of WWCC, as WWCC is successor in interest to Visitel through a merger; and

(12) That Plaintiff be granted such other and further relief as this Court shall deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests that this matter be tried before a jury on all issues triable thereto.

Respectfully submitted,

GILES LENOX

/s/ Brian T. Giles
Brian T. Giles (Fla Bar No. 0929751)
  Trial Attorney
1018 Delta Ave., Suite 202
Cincinnati, Ohio 45208
513-815-3853
Fax:  513-824-8160
Brian@gileslenox.com